IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


CONNECTICUT GENERAL LIFE           )
INSURANCE COMPANY,                 )
                                   )
            Plaintiff/             )
       Counter-Defendant,          )
                                   )
     v.                            )   No. 13 C 4331
                                   )
GRAND AVENUE SURGICAL              )
CENTER, LTD.,                      )
                                   )
            Defendant/             )
       Counter-Plaintiff.          )
-------------------------          )
                                   )
GRAND AVENUE SURGICAL              )
CENTER, LTD.                       )
                                   )
            Plaintiff,             )
                                   )
     v.                            )   No. 13 C 4994
                                   )
CONNECTICUT GENERAL LIFE           )
INSURANCE COMPANY,                 )
                                   )
            Defendant.             )


MEMORANDUM OPINION AND ORDER

     Between June 2008 and December 2013, Grand Avenue Surgical

Center ("GASC") treated over one hundred patients who were

members of a health insurance plan administered by Connecticut

General Life Insurance Company ("CGLIC"), a subsidiary of Cigna

Corporation.

In June 2013, CGLIC filed suit seeking a judgment declaring that GASC is not entitled to any reimbursement because the underlying health insurance plans exclude coverage where, as allegedly occurred here, a provider waives patient cost-sharing fees such as co-insurance, co-payments, and plan deductibles. GASC asserted a counterclaim seeking reimbursement of its charges at the percentage CGLIC allegedly promised to pay during telephone calls that GASC made before scheduling any surgical procedures.

The parties have filed cross motions for summary judgment on their competing claims. I dispose of the motions as follows for the reasons stated below: (1) CGLIC's motion for summary judgment on GASC's promissory estoppel claim is GRANTED only as to the "Schedule II" claims submitted between March 16, 2010 and August 15, 2012; (2) GASC's cross motion for summary judgment on its promissory estoppel claim is DENIED because there is a factual dispute about whether CGLIC made an unambiguous promise to pay; and (3) CGLIC's declaratory judgment claim is DISMISSED as moot because GASC is not pursuing a denial of benefits claim under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., as the assignee of its patients' plan benefits.

I.

The following facts are undisputed unless noted otherwise. My presentation of the facts is divided into two sections: (1) a general description of GASC's policies, practices, and procedures relating to patients with CGLIC-administered health insurance plans and (2) GASC's history of submitting claims to CGLIC between June 2008 and December 2013.

A.

GASC operates an outpatient surgical center in downtown Chicago. Javad "Joe" Jafari has served as GASC's administrator since the surgical center opened its doors in May 2008. Among other duties, Jafari is responsible for supervising the billing and collections specialists who work at GASC's business office in Berwyn, Illinois.

When a surgeon wants to perform a procedure at GASC's downtown office, he or she will submit a Surgery Request Form that includes a photocopy of the patient's insurance card. GASC then attempts to verify that the patient's insurance company will cover the planned procedure. At all relevant times, CGLIC played the following pre-recorded disclaimer at the beginning of all benefits verification calls:

> The following information does not guarantee coverage
> or payment. The governing document for a patient's
> coverage is their Summary Plan Description. Payment
> for services will be based on medical necessity, plan
> provisions, and eligibility at the time of service.

Dkt. No. 112 ("GASC's L.R. 56.1(b)(3)(B) Stmt.") at ¶ 22.[1]  GASC

admits that its employees heard this disclaimer when calling to

verify insurance coverage.  *Id.* at ¶ 25.  As an out-of-network

provider, however, GASC did not have access to the plan

documents referenced in CGLIC's pre-recorded disclaimer.

Accordingly, GASC's practice was to remain on the line long

enough to speak with a live CGLIC agent who could verify the

patient's insurance information.

 After identifying the patient and the billing code for the

planned surgical procedure, GASC employees asked CGLIC's

customer service agents a series of questions set forth on a

"Benefits Rundown Form," including (1) the amount of any plan

deductibles and how much of those amounts the patient had

satisfied; (2) the percentage at which CGLIC would cover out-of-

network services; and (3) the patient's maximum out-of-pocket

expense.  *Id.* at ¶ 26(1)-(2).  Jafari testified that GASC

employees specifically asked--and CGLIC verified--the percentage

of GASC's billed charges that would be covered.  *See* Dkt. No.

---

[1] Since February 2013, CGLIC has used the following disclaimer:
"By continuing this call, you understand, accept, and agree that
the following covered services information does not guarantee
coverage or payment and is subject to all benefit plan
provisions.  Please refer to the Summary Plan Description for
coverage.  Payment for services will be based on medical
necessity, plan provisions, including limitations, and
exclusions, and eligibility at the time of services."  GASC's
L.R. 56.1(b)(3) Stmt. at ¶ 14.

102-2 ("Jafari Dep.") at 37, 76-77. 148, 156-57.  In contrast,

Erica Gallegos, a GASC employee who has made benefits

verification calls from November 2008 to the present, testified

that she did not ask CGLIC what percentage of GASC's billed

charges would be paid.  *See* Dkt. No. 102-6 ("Gallegos Dep.") at

51-52.  According to Ms. Gallegos, she did not ask whether the

percentage CGLIC quoted applied to GASC's billed charges or some

other amount because CGLIC would "never answer" that question.

*Id*. at 41.

Setting aside this conflicting testimony for the moment,

Jafari admits that GASC did not disclose to CGLIC an estimate of

its billed charges when verifying insurance coverage and that

CGLIC did not guarantee payment.  *Id*. at 42-44, 172-73.  GASC

employees confirm that they did not discuss dollar amounts when

calling CGLIC to verify coverage.  GASC's L.R. 56.1(b)(3)(B)

Stmt. at ¶ 30(1).  Indeed, CGLIC asserts that its customer

service agents "are trained not to promise or guarantee payment

to a provider during a pre-service call."  Dkt. No. 100-1

("Cisar Declar.") at ¶ 13.

After CGLIC verified the percentage at which it would cover

GASC's billed charges, GASC scheduled the patient for surgery.

On the day of the surgery, the patient assigned his or her

health insurance benefits to GASC and executed a guaranty of

payment.  Jafari Dep. at 185-86.  After the surgery, one of the

employees in the Berwyn office prepared an insurance claim and presented it to Jafari for review.  Jafari, who rarely made changes to insurance claims, then instructed one of GASC's employees to submit the claim to the appropriate insurance company.

About thirty to sixty days later, GASC and the patient would receive an Explanation of Benefits ("EOB") showing what percentage of the billed charges the insurance company was paying and any charges for which the patient was responsible. The EOBs that CGLIC sent to GASC are, in many cases, unclear about whether the patient owes cost-sharing fees.  In June 2009, for example, CGLIC sent an EOB to GASC that listed deductible and co-insurance amounts of $500 and $2,000, respectively.  *See* Dkt. No. 124-1 at 4.  Yet the same EOB includes two statements that introduce confusion: (1) "the $500 out of network deductible has been satisfied for 2009" and (2) "the $2,500 out of network 'out-of-pocket limit' has been reached for 2009." *Id*.  According to CGLIC, GASC should have billed the patient for cost-sharing fees listed on the EOB in these circumstances; in other words, the language at the bottom of the EOB meant, "*If* the patient pays the cost-sharing fees shown above, *then* his or her plan deductible and out-of-pocket limit for 2009 will be satisfied."  GASC was not aware of this hidden meaning and interpreted such EOBs to mean that the patient had already

satisfied all cost-sharing responsibilities.  *See* Jafari Dep. at
197, 202.

After GASC received an EOB from CGLIC, one of GASC
collections specialists prepared a patient bill for the cost-
sharing fees shown on the EOB and presented the bill to Jafari
for review.  GASC's L.R. 56.1(b)(3)(B) Stmt. at ¶ 37.  Jafari
testified that he rarely revised patient bills and denied that
GASC ever waived patient cost-sharing fees based a surgeon's or
a patient's complaint.  Jafari Dep. at 180-81.  In contrast,
Inez Novak, a collection specialist who worked for GASC from
2008 to 2011, testified that when patients complained about a
bill, Jafari or his father would instruct her to write off the
charges "most of the time."  GASC's L.R. 56.1(b)(3) Stmt. at ¶
43(2) (citing Dkt. No. 102-5 ("Novak Dep.") at 75-76).
Moreover, Novak said that "99 percent of the time" when she
prepared a patient bill for cost-sharing fees, Jafari or his
father would tell her not to send it.  *Id*. (citing Novak Dep. at
35-36).

In some cases, EOBs from CGLIC included a footnote
instructing GASC to contact a third party--e.g., companies
called Viant, MultiPlan, or NHBC--before billing the patient.
Jafari at 133.  GASC's practice was to contact the third party
and attempt to negotiate a higher reimbursement amount, which
could change the cost-sharing fees owed by the patient.  *Id*.

When GASC and the third party agreed on a higher reimbursement amount, they signed a contract in which GASC accepted a specific amount as "payment in full" for the underlying claim. *See* Dkt. No. 102-31 at 116 (MultiPlan agreement), 1347 (NHBC agreement), 2355 (Viant agreement).

B.

From June 2008 through January 2010, GASC treated seventeen patients with CGLIC health insurance plans. *See* Dkt. No. 114 ("CGLIC's L.R. 56.1(b)(3)(B) Stmt.") at ¶¶ 12-13. The parties refer to this group as "Schedule I" patients or claims. CGLIC asserts, without contradiction from GASC, that it paid over $342,000 to GASC for Schedule I claims.[2] There is a dispute, however, over the amount GASC should have billed and collected from Schedule I patients for cost-sharing fees. As explained *infra* in Section II, the competing arguments on that issue are legally irrelevant to GASC's promissory estoppel claim.

Acting on a tip received in 2009, CGLIC started investigating whether GASC was engaging in fee forgiveness (i.e., failing to collect patient cost-sharing fees). *See Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 699 (7th Cir.

---

[2] This fact is drawn from Paragraph 1 of CGLIC's L.R. 56.1(b)(3)(C) statement of additional materials facts, *see* Dkt. No. 114 at 14-19, to which GASC did not file any response. "All material facts set forth in the statement filed pursuant to [L.R. 56.1](b)(3)(C) will be deemed admitted unless controverted by the statement of the moving party." L.R. 56.1(a).

1991) (explaining that cost-sharing fees are designed to
"sensitize [patients] to the costs of health care, leading them
not only to use less but also to seek out providers with lower
fees").  According to CGLIC, the health insurance plans that it
administers exclude coverage "for charges that the covered
person has no obligation to pay."  Dkt. No. 100-1 at ¶ 7.  When
a provider waives cost-sharing fees, treats a patient's payment
guaranty as a mere formality, and looks to the insurance company
as the sole source of payment, CGLIC argues that the plan
exclusion quoted above means that neither the patient nor the
provider (when acting as assignee of the patient's plan
benefits) is entitled to coverage.

On March 19, 2010, CGLIC flagged GASC for fee forgiveness.
In a letter advising GASC of this determination, CGLIC stated
that it would not pay any of GASC's claims unless or until GASC
presented "clear evidence" that (1) "the charges shown on the
[GASC] claims are [GASC's] actual charges for the services
rendered" and (2) "the [plan member] is required to pay the
applicable full out-of-network coinsurance and/or deductible."
Dkt. No. 100-2.  GASC understood from the March 19 letter that
CGLIC would not pay any future claims until GASC proved that it
was billing patients for cost-sharing fees.  Jafari Dep. at 98,
142.

On July 21, 2010, Jafari sent CGLIC a letter disputing the fee forgiveness determination, but he failed to support his denial with any evidence. *Id*. at 100. CGLIC confirms that it never obtained documentation from GASC showing that it had billed or collected patient cost sharing fees. Nunes Dep. at 27.

Despite CGLIC's warning that it would no longer pay GASC's claims until the fee forgiveness issue had been resolved, GASC continued to treat patients with CGLIC health insurance plans. As Jafari explained,

> The [GASC] billing department continued business as normal by way of if any patient was scheduled that had Cigna insurance, just as always we did, we would call, verify for benefits, make sure that we spoke to an actual person, confirmed all eligibility and benefits, and if benefits were given, confirm, then verified. We would rely upon that information and go ahead and proceed with the procedure as requested.

Jafari Dep. at 142-43. It is not clear why CGLIC's customer service agents continued to verify patient benefits after GASC had been flagged for fee forgiveness in March 2010. Jafari acknowledges, however, that GASC was aware of the possibility that CGLIC would deny any claims submitted after March 2010 because of the fee forgiveness issue. *Id*. at 142, 204. The record shows that CGLIC denied twenty-seven claims that GASC submitted between March 2010 and mid-August 2012 because of the fee forgiveness issue, yet continued to pay some of GASC's

10

claims.  *See* GASC's L.R. 56.1(b)(3)(B) Stmt. at ¶¶ 18(1), 45(1)-(2); CGLIC's L.R. 56.1(b)(3)(B) Stmt. at ¶ 23.  I will refer to the claims submitted during this period as "Schedule II" claims.

On March 22, 2011, CGLIC asked GASC to produce its billing legers for a specific list of patients and advised that it would continue to deny GASC's claims without such information.  GASC never provided the requested patient ledgers.  Jafari Dep. at 103.

On August 15, 2012, CGLIC lifted the fee forgiveness flag that had been in place since March 2010.  CGLIC says that it resumed paying GASC's claims after receiving assurance from GASC's counsel, Mark D. Olson, that his client "would bill for and collect all patient cost shares on a going-forward basis." Cisar Declar. at ¶ 12.  In contrast, GASC believes that CGLIC resumed paying claims based on GASC's presentation of documents showing that it had never engaged in fee forgiveness.  *See* Jafari Dep. at 146.  In any event, GASC submitted thirty-six claims to CGLIC after the fee forgiveness issue had been resolved (henceforth referred to as "Schedule III" claims or patients).  The parties agree that CGLIC paid GASC over $197,000 on these Schedule III claims.  *See* GASC's L.R. 56.1(b)(3) Stmt. at ¶ 18(4).  What remains in dispute is whether GASC is entitled to additional payment on these claims based on a promise CGLIC

made when GASC called before each patient's surgery to verify insurance coverage.

## II.

I start with the parties' cross motions for summary judgment on GASC's promissory estoppel counterclaim.

"As with any summary judgment motion, [I] review cross-motions for summary judgment 'construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party.'" *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (quoting *Wisc. Central, Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008)). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is genuinely in dispute when "the evidence [viewed through the lens of summary judgment] is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The parties agree that GASC's promissory estoppel claim is governed by Illinois law. To survive CGLIC's motion for summary judgment, GASC must present evidence from which a trier of fact could find that "(1) [CGLIC] made an unambiguous promise to plaintiff, (2) [GASC] relied on such promise, (3) [GASC's] reliance was expected and foreseeable by [CGLIC], and (4) [GASC]

12

relied on the promise to its detriment." *Newton Tractor Sales,
Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 523-24 (Ill. 2009)
(citing *Quake Constr., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d
990 (Ill. 1990)).

CGLIC attacks the first and third elements of GASC's
promissory estoppel claim; that is, CGLIC argues that (1) it
never made an "unambiguous promise" to pay a specific percentage
of GASC's billed charges during a telephone call to verify the
patient's insurance benefits and (2) GASC's reliance on any
representations CGLIC made during such calls was neither
"expected" nor "foreseeable" because of the pre-recorded
disclaimer that played before GASC employees spoke with a live
customer service agent. *Id*.

A.

There is a factual dispute about whether CGLIC's agents
unambiguously promised to pay a specific percentage of GASC's
billed charges. Jafari testified that the GASC employees who
verified patient benefits expressly asked CGLIC to verify the
percentage of GASC's billed charges that would be covered. *See*
Jafari Dep. at 37, 76-77. 148, 156-57. According to Jafari,
CGLIC responded to these inquiries by promising to cover a
specific percentage of GASC's billed charges. *Id*. at 46-47,
155, 157. In contrast, Ms. Gallegos testified that she did not
ask CGLIC's agents what percentage of GASC's billed charges

13

would be covered. Gallegos Dep. at 51-52. Indeed, Ms. Gallegos said that CGLIC would "never answer" that type of question. *Id.* at 41. CGLIC, for its part, has not presented any evidence about whether its customer service agents verified the percentage at which GASC's charges would be covered. The most CGLIC says on this point is that its agents were trained not to promise or guarantee payment. Cisar Declar. at ¶ 13. CGLIC has not produced any recorded calls, call transcripts, employee training manuals, or affidavits from its customer service representatives.

At the summary judgment stage, I cannot evaluate the credibility of witnesses or resolve conflicting testimony over whether CGLIC promised to pay a specific percentage of GASC's billed charges. This factual dispute distinguishes this case from *Centro Medico Panamericano, Ltd. v. Laborers' Welfare Fund*, No. 1-14-1690, 2015 WL 1119579 (Ill. App. Ct. Mar. 11, 2015), where the health care provider seeking reimbursement under a promissory estoppel theory "did not provide any evidence, such as testimony from any of its claim representatives or an actual transcript of the calls, suggesting that [the insurer's] representatives made [the provider] an unambiguous oral promise [about reimbursement]." *Id.* at *3. In this case, a reasonable trier of fact could credit Jafari's testimony and conclude that CGLIC promised to pay GASC's billed charges at a specific

14

percentage.  This promise is not too ambiguous to support a promissory estoppel claim simply because it was stated as a formula rather than a specific dollar amount.  Alternatively, the trier of fact could credit Gallegos's testimony and find that CGLIC did not promise to pay a specific percentage of GASC's billed charges.  Where, as here, the evidence could support a finding on either side of an issue, summary judgment is not appropriate.

B.

CGLIC's next argument is that even if the evidence could support a finding that CGLIC promised to pay a specific percentage of GASC's billed charges, it was unreasonable for GASC to rely on that promise because of the disclaimer that CGLIC played at the beginning of benefits verification calls.

CGLIC invokes the following principle in support of its unreasonable reliance argument:

> If someone tells you "I promise you X, but don't hold me to it," the promisor is making clear that he is not inviting reliance and the promisee cannot, by ignoring the warning and relying on the promise to his detriment, make the promise enforceable.  Such a "promise" may create an expectation but does not create a commitment, and so the promisee relies at his risk.

*ATA Airlines, Inc. v. Federal Express Corp.*, 665 F.3d 882, 888 (7th Cir. 2011) (applying Tennessee law).  "Acting on a hope is

not reasonable reliance." *Id*. (citing cases applying Indiana law).

Setting aside these general principles, CGLIC has cited only two cases in which a court enforced a disclaimer against a health care provider.[3] These two cases, however, are factually distinguishable. *See Loyola Univ. of Chicago v. Humana Ins. Co.*, 996 F.2d 895, 902 (7th Cir. 1993) (rejecting health care provider's estoppel argument because insurance company made no representations regarding coverage and expressly said that a coverage decision would be made later); *Venor, Inc. v. Standard Life & Acc. Ins. Co.*, 317 F.3d 629, 643 (6th Cir. 2003) (rejecting health care provider's estoppel argument because plan document that allegedly contained promise of coverage expressly said that statements contained therein were not controlling). GASC, for its part, has not cited any Illinois cases shedding light on whether CGLIC's disclaimer is fatal to GASC's promissory estoppel claim.

In my view, a reasonable jury could find that GASC's reliance on oral promises of coverage at a specific percentage of billed charges was "expected and foreseeable" by CGLIC.

---

[3] CGLIC's other cited authorities do not apply Illinois law and/or involve factual scenarios that are far afield from health care provider's interactions with insurance companies before treating patients. *See Workman v. United Parcel Serv., Inc.*, 234 F.3d 998 (7th Cir. 2000); *Thacker v. Menard, Inc.*, 105 F.3d 382 (7th Cir. 1997); *Jackson v. Avanti/Case-Hoyt, Inc.*, No. 02 C 7001, 2003 WL 942840 (N.D. Ill. Mar. 5, 2003).

*Newton Tractor*, 906 N.E.2d at 523. The purpose of GASC's calls
was to verify whether a patient had insurance coverage before
scheduling a surgical procedure. "'In this context [a jury
could infer] that [CGLIC] knew or should have known that its
representation would induce action on the part of [GASC]
(i.e., that [GASC] would admit and treat [patients] on the basis
of its representation[s] as to available coverage).'" *Chatham
Surgicore, Ltd. v. Health Care Serv. Corp.*, 826 N.E.2d 970, 976
(Ill. App. Ct. 2005) (quoting *Rehabilitation Institute of
Chicago v. Group Administrators, Ltd.*, 844 F. Supp. 1275, 1279
(N.D. Ill. 1994)). Indeed, CGLIC's disclaimer suggests that it
was aware of the possibility that patients and providers would
rely on representations of coverage made during the call. GASC
did not have access to the plan documents referenced in the
disclaimer and relied solely on CGLIC's representations of
coverage. In these circumstances, I cannot say that a
disclaimer referencing plan documents that were not in GASC's
custody, possession, or control made its reliance on CGLIC's
representations unreasonable as a matter of law. This does not
mean that the disclaimer is legally irrelevant. A judge or jury
must weigh all of the evidence in this case and decide whether
it was reasonable for GASC to rely on CGLIC's representations of
coverage in spite of the disclaimer.

I reach a different conclusion, however, about the Schedule II claims that were submitted after CGLIC had flagged GASC for engaging in fee forgiveness.  Whether GASC was actually waiving patient cost-sharing fees is beside the point.  What matters is that GASC was on notice starting on March 19, 2010 that CGLIC would not pay any further claims unless or until GASC presented evidence that it was billing and collecting patient cost-sharing fees.  Jafari admits that GASC was aware of the possibility that CGLIC would deny any claims submitted after March 2010 because of the fee forgiveness issue and decided not to submit any documentation to clear up the issue until August 2012.  Jafari Dep. at 100, 142, 204.  No judge or jury could find that GASC acted reasonably in relying on promises of coverage that were directly contradicted by the March 19, 2010 letter and simultaneously refusing to comply with CGLIC's request for billing and collection records.  Therefore, I grant summary judgment to CGLIC on GASC's promissory estoppel claim between March 19, 2010 and August 15, 2012 when the fee forgiveness flag was lifted.

C.

CGLIC's final attacks on GASC's promissory estoppel claim are an unclean hands defense and a contract-based defense.

"The doctrine [of unclean hands] applies if the party seeking equitable relief is guilty of misconduct, fraud or bad

18

faith toward the party against whom relief is sought if that misconduct is connected with the transaction at issue." *Long v. Kemper Life Ins. Co.*, 553 N.E.2d 439, 441 (Ill. App. Ct. 1990). According to CGLIC, GASC has unclean hands because it misrepresented its billing and collection practices in August 2012 to get the fee forgiveness flag lifted. The problem with this argument is that GASC's only source of information about whether a patient owed cost-sharing fees was the EOB received after submitting a claim. As explained *supra* at Section I.A., CGLIC generated EOBs that were at best ambiguous about whether cost-sharing fees were owed. *See* Dkt. No. 124-1 at 4 (EOB dated June 4, 2009 listing $2,500 in patient cost-sharing fees followed by text indicating that patient "has satisfied" her out-of-network deductible and that her out-of-pocket limit "has been reached"). It cannot be said that GASC has unclean hands simply because it failed to interpret such ambiguous EOBs as requiring the patient to be billed for cost-sharing fees.

CGLIC's other defense is based on agreements that GASC signed when settling certain disputed claims with third party companies like Viant, MultiPlan, and NHBC. CGLIC points, for example, to language in a January 2013 contract between GASC and NHBC in which GASC agreed to accept a specified amount as "payment in full" on the underlying claim. *See* Dkt. No. 102-31 at 1347; *see also id.* at 116 (MultiPlan agreement dated Nov. 12,

19

2012 containing similar language), 2355 (Viant agreement dated

Mar. 8, 2010 containing similar language). These agreements

preclude GASC from pursuing additional reimbursement for the

underlying claim. Indeed, GASC has not explained how its

promissory estoppel claim could be compatible with the language

in these settlement agreements. It is unclear how many

settlement agreements GASC signed with respect to the Schedule I

and III claims.

III.

I turn finally to the parties' cross motions for summary

judgment on CGLIC's claim for a judgment declaring that GASC is

not entitled to payment on any claims because the underlying

health insurance plans exclude coverage when a provider engages

in fee forgiveness.

This clam is moot. I have already ruled that GASC's

promissory estoppel counterclaim is not an ERISA denial of

benefits claim in disguise. *See* Dkt. No. 63 (holding that ERISA

does not preempt GASC's counterclaim).[4] If GASC intended to sue

---

[4] CGLIC attempts to re-litigate the ERISA preemption issue in its
motion for summary judgment. *See* Dkt. No. 99-1 at 14-15
(arguing that GASC is barred from asserting a promissory
estoppel claim because it received an assignment of ERISA plan
benefits from its patients). "Simply because at one point in
time [GASC] acknowledged an assignment [of benefits] from [its
patients] does not mean that it simultaneously and implicitly
gave up any claim(s) it had against [CGLIC] apart from that
assignment." *Franciscan Skemp Healthcare, Inc. v. Central*

under ERISA to recover wrongfully withheld plan benefits, it was required to assert that ground for relief as a counterclaim in this case. *See* Fed. R. Civ. P. 19(a)(1) ("A pleading must state as a counterclaim any claim that--at the time of its service-- the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction."). GASC is now barred from asserting a denial of ERISA plan benefits claim. *See Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n.1 (1974) ("A counterclaim which is compulsory but is not brought is thereafter barred.").

As things stand, CGLIC seeks a declaratory judgment on a hypothetical ERISA claim that GASC has not raised here and cannot assert later. It would be a purely academic exercise to wade through each GASC patient's health insurance plan, find the provisions relating to fee forgiveness, and examine GASC's billing and collection records to determine whether there is sufficient evidence of fee forgiveness to preclude coverage under the patient's plan.

---

*States Joint Bd. Health and Welfare Trust Fund*, 538 F.3d 594, 598 (7th Cir. 2008)).

IV.

I grant CGLIC's motion for summary judgment on GASC's
promissory estoppel claim only as to the "Schedule II" claims;
deny GASC's cross motion for summary judgment on its promissory
estoppel claim; and dismiss CGLIC's declaratory judgment claim
as moot for the reasons stated above.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: April 21, 2015